UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW PUGLIA,

        Plaintiff,

v.                        Case No. 8:22-cv-1954-VMC-CPT

ALVIN NIENHUIS, individually
and in his official capacity
as Sheriff of Hernando
County, Florida; KENNETH HAYDEN;
PHILIP LAKIN; SCOTT REAK;
JOHN ELLIS; WILLIAM HILLMAN;
and JOSEPH McCLENNAN,

        Defendants.
_____/

**ORDER**

This matter is before the Court on consideration of Defendant Sheriff Alvin Nienhuis, Kenneth Hayden, Philip Lakin, Scott Reak, John Ellis, William Hillman, and Joseph McClennan's Motion to Dismiss Amended Complaint (Doc. # 48), filed on January 20, 2023. Plaintiff Matthew Puglia responded on February 17, 2023. (Doc. # 53). The Motion is granted in part and denied in part as set forth below.

**I.**   **Background**

Mr. Puglia was hired as a Deputy Sheriff with the Hernando County Sheriff's Office (HCSO) in early July 2020. (Doc. # 47 at 3). "Upon hire, [Mr.] Puglia was classified as

1

[a] probationary deputy and was required to satisfactorily serve a probationary period of one year, at which time he would be deemed a 'regular appointee' pursuant to Florida statute § 30.07(4)." (Id. at 3-4). "All probationary status deputies are required to successfully complete the field training program. According to HCSO policy and procedure, the work performance of probationary deputies is evaluated monthly." (Id. at 4).

Mr. Puglia successfully completed his field training in December 2020, at which point he was assigned to a shift. (Id.). In March 2021, Mr. Puglia was reassigned to a different shift. "Up until this time, no disciplinary reports were directed to [Mr.] Puglia nor was [Mr.] Puglia verbally informed of any performance deficiencies." (Id.). Around April 2021, Defendant McClennan, who is also an HCSO Deputy Sheriff, "was introduced to [Mr.] Puglia's significant other at a shooting range at which [Deputy] McClennan had previously been employed." (Id.). Deputy McClennan attempted to connect with Mr. Puglia's significant other on Facebook and, over the next days and weeks, "engaged in sexually-suggestive and boorish behavior directed to [Mr.] Puglia regarding his significant other." (Id.).

In May 2021, in front of multiple deputies as well as Defendant Reak, an HCSO Lieutenant with "supervisory responsibility over [Mr.] Puglia," and Defendant Hillman, an HCSO Sergeant with "supervisory responsibility over [Mr.] Puglia," Deputy McClennan made a rude and sexually explicit comment about Mr. Puglia's significant other. (Id. at 2, 5). Mr. Puglia "objected and told [Deputy] McClennan 'enough was enough.'" (Id. at 5). Sergeant Hillman was later verbally reprimanded by an HCSO member for "failure to censure [Deputy] McClennan over his inappropriate comments." (Id. at 6).

Soon thereafter, Mr. Puglia alleges he began facing retaliatory harassment. (Id. at 7). The retaliatory harassment included, among other things: (1) the rejection rate for Mr. Puglia's reports "surg[ing]"; (2) Lieutenant Reak's informing Mr. Puglia that Mr. Puglia had a "bad name," was "no longer welcome at HCSO," and that Mr. Puglia's report writing was terrible; (3) Defendant HCSO Colonel Hayden's refusal to transfer Mr. Puglia to another squad based on the retaliation; (4) the extension of Mr. Puglia's probationary period through October 5, 2021; (5) the "fabrication" of Mr. Puglia's probationary reports for prior months by both Sergeant Hillman and Defendant Ellis, an HCSO Sergeant with "supervisory responsibility over [Mr.] Puglia," who stated

3

that Mr. Puglia's "report writing skills were deficient." (Id.).

In early September 2021, an HCSO Lieutenant who is not a defendant in this action emailed a recommendation that Mr. Puglia's probation be extended again. (Id. at 8). Defendant Lakin, an HCSO Major with "supervisory responsibility over Puglia" as well as Lieutenant Reak and Sergeants Ellis and Hillman, "requested weekly updates of [Mr.] Puglia's report writing progress." (Id.). In mid-September 2021, Sergeant Ellis wrote a memo to Major Lakin regarding Mr. Puglia's report writing deficiencies, which relied on the "fabricated" probationary reports. (Id.). A few days later, Major Lakin wrote a memo to an HCSO Colonel who reported directly to Sheriff Nienhuis. (Id. at 9). This memo recommended an extension of Puglia's probation because of Mr. Puglia's alleged performance deficiencies. (Id.).

"A little over a month later, on October 29, 2021, HCSO placed [Mr.] Puglia on administrative leave pending the outcome of an Internal Affairs investigation. . . . Immediately thereafter, [Mr.] Puglia received an Interoffice Memorandum from Sheriff Nienhuis dated November 1, 2021, informing him that in light of the Internal Affairs investigation, Puglia's probationary period, which had been

previously extended until November 5, 2021, was again extended until November 30, 2021." (Id. at 9-10). The Internal Affairs investigation was based on an accusation by Lieutenant Reak, Sergeant Ellis, and Sergeant Hillman that Mr. Puglia "us[ed] anonymous ghost writers to write his reports" given "the notable improvement in [Mr.] Puglia's report writing." (Id. at 10). However, Mr. Puglia had merely asked certain other "certified police officers" outside of the HCSO for "pointers in writing reports," which was not a "violation of Florida law." (Id. at 11). The Internal Affairs interviews of Lieutenant Reak, Sergeant Ellis, and Sergeant Hillman "focused on [Mr.] Puglia's report writing and on [Deputy] McClennan as well." (Id. at 12).

During Mr. Puglia's interview for the Internal Affairs investigation into his report writing in late November 2021, Mr. Puglia was asked whether he thought HCSO had responded appropriately to Deputy McClennan's "hostile workplace behavior" by issuing McClennan an Employee Improvement Report. (Id. at 13). Mr. Puglia stated that he was not satisfied with the discipline Deputy McClennan received because he did not think it "was [sufficient] for that kind of comment" and because, after Deputy McClennan was disciplined, "things started getting worse[,] like [Mr.

Puglia] heard from other deputies that [he] was considered[,] being called a rat because Sergeant, Sergeant . . . Hillman or Reak got in trouble." (Id. at 13-14).

On December 7, 2021, Investigator Stephens, who headed the Internal Affairs investigation, "sent an Interoffice Memorandum to [Sheriff] Nienhuis presenting the complete Investigative Report for [Sheriff] Nienhuis' review and sustaining the alleged violations against [Mr.] Puglia." (Id. at 14). Also on December 7, "after [Mr.] Puglia's second probationary period had run on November 30, 2021, Major Hayden prepared an Interoffice Memorandum to Sheriff Nienhuis dated December 8, 2021, recommending that Sheriff Nienhuis terminate [Mr.] Puglia immediately" based on performance deficiencies. (Id.).

Major Hayden's December 8 Interoffice Memorandum stated that Mr. Puglia's probationary status had only been extended twice, up through November 30, 2021. (Id. at 15). This is notable because, as the amended complaint explains in a footnote, Mr. Puglia's counsel was provided during this litigation "an Interoffice Memorandum dated November 29, 2021, from Major Hayden" that "purports to be a third extension of [Mr.] Puglia's probationary period until December 18, 2021, that was allegedly provided to [Mr.] Puglia

on November 30, 2021." (<u>Id.</u> at 15 n.4). Mr. Puglia does not recall being given a copy of this document on November 30, 2021, nor was the document turned over "pursuant to multiple public records requests." (<u>Id.</u>). "Upon information and belief, the purported third probationary period did not take effect because it did not receive required approvals through the HCSO chain of command." (<u>Id.</u>).

Later on December 8, 2021, "a letter was prepared by Sheriff Nienhuis terminating [Mr.] Puglia." (<u>Id.</u> at 16). According to the amended complaint, Mr. Puglia "had completed his second probationary extension at the time of his termination and therefore was in fact a career-service member entitled to certain rights and procedural protections." (<u>Id.</u> at 17).

"By correspondence to [Major] Hayden dated December 17, 2021, counsel for [Mr.] Puglia requested a name clearing hearing pursuant to [Sheriff] Nienhuis' termination letter." (<u>Id.</u>). "In an email dated December 30, 2021, Major Hayden responded saying that '[t]he purpose of a Name-Clearing is limited to affording a separated employee the opportunity to clear his or her name with regard to any factual matters contained in a public record. The Sheriff's Office is sincere in its desire to reduce the risk of error in this matter. In

lieu of the recorded meeting[,] a statement may be provided by Mr. Puglia to be included in his personnel file.'" (Id.). "On December 31, 2021, counsel for [Mr.] Puglia responded and stated that '[i]n lieu of scheduling a meeting, [Puglia] would prefer to provide a statement to be included in his personnel file. I have attached a copy of the letter that I sent to the Sheriff three weeks ago. It tells my client's side of the story.'" (Id. at 17-18). Mr. Puglia alleges that the submission of the name-clearing letter by his counsel was a name-clearing hearing, but such hearing was "meaningless" because of "the bad faith manner with which he was treated by HCSO" — that is, the earlier placement of "fabricated" reports and memoranda "in his personnel file that resulted in his termination." (Id. at 21). Additionally, he alleges that "HCSO never made any findings as to the contents of his written submission and [Mr.] Puglia received no response from HCSO." (Id. at 18).

Mr. Puglia also alleges that the HCSO provided "a false affidavit-of-separation" to the Florida Department of Law Enforcement stating that Mr. Puglia's employment ended via "voluntary separation" in order "to cover up its illegal behavior with regard to its trampling of [Mr.] Puglia's due process rights." (Id. at 18-19). "The absence of an adequate

state remedy to cure HCSO's failure to provide a meaningful opportunity for [Mr.] Puglia to clear his name is established by HCSO's execution and submission of the false termination affidavit and its submission to the FDLE pursuant to Florida statute § 943.139(2)." (Id. at 22).

Mr. Puglia initiated this case on August 25, 2022, asserting claims under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment due process rights and for First Amendment retaliation. (Doc. # 1). Upon Defendants' motion to dismiss, the Court dismissed the First Amendment retaliation claim with prejudice and granted leave to amend the due process claims. (Doc. # 45).

Puglia then filed an amended complaint on January 6, 2023, asserting a Fourteenth Amendment due process property interest claim (Count I) and due process liberty interest claim (Count II). (Doc. # 47). Now, Defendants move to dismiss both claims with prejudice. (Doc. # 48). Puglia has responded (Doc. # 53), and the Motion is ripe for review.

## II.  **Legal Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250,

1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

**III. Analysis**

**A.   Due Process Property Interest Claim**

In Count I, Mr. Puglia asserts a procedural due process claim based on his alleged property interest in his employment. (Doc. # 47 at 19-21). He alleges that he "completed his extended probationary periods on November 30,

2021, and was therefore a career-service officer pursuant to Section 5(a) of House Bill 1441 and HCSO General Order 3065.00. By virtue of [his] status as a career-service officer, [Mr.] Puglia possessed a protected property interest in continued employment with HCSO." (Id. at 20).

The Fourteenth Amendment prohibits states from depriving anyone of "life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. "Procedural due process rules are not meant to protect persons from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "To prevail on a procedural due process claim, Plaintiff must establish: (1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation." Lacy v. City of St. Petersburg, Fla., No. 8:14-cv-252-VMC-TGW, 2014 WL 4376201, at *5 (M.D. Fla. Sept. 4, 2014) (citing Bank of Jackson Cnty. v. Cherry, 980 F.2d 1362, 1366 (11th Cir. 1993)), aff'd, 608 F. App'x 911 (11th Cir. 2015). "The essential elements of procedural due process are notice and an opportunity to be heard before one is deprived of a protected interest." Id.

"Because deputy sheriffs are not employees and both their selection and retention come under the absolute control of the sheriff, courts have held that Florida deputy sheriffs have no property or liberty interests in their positions for purposes of the Fourteenth Amendment." Stough v. Gallagher, 967 F.2d 1523, 1530 (11th Cir. 1992). A "limited exception provides that deputy sheriffs can hold a property interest in their employment pursuant to a career civil service system." Wicher v. Osceola Cnty. Sheriff's Off., No. 6:10-cv-1072-ACC-GJK, 2011 WL 13136514, at *4 (M.D. Fla. Sept. 16, 2011), aff'd, 503 F. App'x 732 (11th Cir. 2013).

According to Defendants, this claim fails because Mr. Puglia was still on probationary status — and thus did not have a protected property interest in continued employment — as of December 8, 2021. (Doc. # 48 at 8-10). Although they acknowledge Puglia's allegation that he was not on probation at the time of his termination, Defendants maintain that this allegation is implausible: "[Mr.] Puglia's Amended Complaint invites this Court to believe it was plausible that he successfully completed his probationary status as a deputy sheriff between the temporal period of November 30, 2021 and December 8, 2021, a temporal period when he remained on paid administrative leave, his Internal Affairs investigation

12

remained pending, and while he had not yet been reinstated to active duty from his paid administrative leave." [1] (Id. at 9). According to Defendants, the amended complaint's "allegations confirm that [Mr.] Puglia could not have a reasonable belief of being elevated to career service status unless and until (1) the pending Internal Affairs investigation into his possible policy violations had been completed, and (2) his administrative leave ended and (3) he returned to active duty as a deputy sheriff" but the amended complaint "establishes that these three things did not ever happen." (Id.).

The Court disagrees with Defendants. As with the prior motion to dismiss, Defendant's argument that Mr. Puglia did not have a property interest in his job because he was a probationary employee fails at this stage. The amended complaint explicitly alleges that Mr. Puglia's extended probationary status ended on November 30, 2021. (Doc. # 47 at

---

[1] Defendants also cite in the background section of their Motion a document dated November 29, 2021, that purports to extend Puglia's probationary status through December 18, 2021. (Doc. # 48 at 3; Doc. # 49). Notably, however, Defendants do not address or rely on this document in their argument for dismissal. (Doc. # 48 at 8-10). Additionally, Puglia disputes the authenticity and "veracity" of this document. (Doc. # 53 at 6). Indeed, in the amended complaint, Puglia raises doubts about the document and further alleges that this "purported third probationary period did not take effect because it did not receive required approvals through the HCSO chain of command." (Doc. # 47 at 15 n.4).

10). Mr. Puglia was not terminated until December 8, 2021, "after [Mr.] Puglia's second probationary period had run" and he had become a career-service officer. (Id. at 14, 20). Thus, taking all allegations as true, Mr. Puglia has plausibly alleged that he was terminated after his probationary status had ended and he was a career-service officer with a property interest in his employment. The Court will not draw inferences against Mr. Puglia, as Defendants would have the Court do by assuming that Mr. Puglia must still have been on probation on December 8 because he was on administrative leave at that time. Defendants, however, will have the opportunity to raise this argument again at the summary judgment stage.

The Motion is denied as to Count I.

**B. Due Process Liberty Interest Claim**

"[W]hen reputational damage is sustained in connection with a termination of employment, it may give rise to a procedural due process claim for deprivation of liberty which is actionable under section 1983." Cotton v. Jackson, 216 F.3d 1328, 1330 (11th Cir. 2000). "To establish a liberty interest claim, [Mr. Puglia] must establish: (1) a false statement; (2) of a stigmatizing nature; (3) attending a governmental employee's discharge; (4) made public; (5) by the governmental employer; and (6) without a meaningful

14

opportunity for a name clearing hearing." <u>Whitfield v. City of Hallandale Beach, Fla.</u>, No. 19-CV-60926-WPD, 2021 WL 4987938, at *7 (S.D. Fla. May 14, 2021) (citing <u>Buxton v. City of Plant City, Fla.</u>, 871 F.2d 1037, 1042-43 (11th Cir. 1989)). "The hearing can be held either before or after the termination or publication." <u>Cotton</u>, 216 F.3d at 1330.

Only the sixth element is at issue for Count II here. "With regard to this last element, . . . the process due is that which will allow the aggrieved party to 'clear his name.' This means that during the name clearing hearing the employee must have the opportunity to 'support his allegations by argument however brief, and, if need be, by proof, however informal.'" <u>Lapham v. Fla. Dep't of Corr.</u>, No. 07-80964-CIV, 2009 WL 151161, at *2 (S.D. Fla. Jan. 21, 2009) (quoting <u>Harrison v. Wille</u>, 132 F.3d 679, 683 n.9 (11th Cir. 1998); <u>Campbell v. Pierce County Ga.</u>, 741 F.2d 1342, 1345 (11th Cir. 1984)). "[T]his opportunity [for a name-clearing hearing] is not as strict as the process required before one can be deprived of a property interest." <u>Id.</u> at *2 (quoting <u>Harrison</u>, 132 F.3d at 683 n.9).

Here, Mr. Puglia has not plausibly alleged that there was not "a meaningful opportunity for a name clearing hearing." <u>Whitfield</u>, 2021 WL 4987938, at *7. Rather, the

15

amended complaint alleges that Mr. Puglia was offered a name-clearing hearing or the alternate option to submit a name-clearing letter for his personnel file. (Doc. # 47 at 17). Furthermore, the amended complaint alleges that Mr. Puglia, through his counsel, elected to submit a name-clearing letter rather than hold a name-clearing hearing. (Id.). And, indeed, Mr. Puglia's counsel drafted and submitted such name-clearing letter, which was placed in Mr. Puglia's personnel file. (Id. at 17-18).

While Mr. Puglia alleges this "name clearing hearing was tainted and rendered meaningless by the bad faith manner with which he was treated by HCSO" and that "HCSO took no further action and made no findings as to [Mr.] Puglia's defenses" (Id. at 21), these allegations do not plausibly state a liberty interest claim. "[T]he only process due [Mr. Puglia] to protect his liberty interest was a 'name clearing hearing.'" Harrison, 132 F.3d at 683 n.9. Thus, a liberty interest claim based on reputational damage does not exist where a plaintiff has had a name-clearing opportunity but is simply displeased with the result. See Campbell, 741 F.2d at 1346 ("[T]he purpose of the hearing was not to re-evaluate appellant's termination but to allow her to clear her name."); Lapham, 2009 WL 151161, at *2 ("To the extent that the

opportunity for name clearing was not 'meaningful' to him because the hearing officer failed to credit his testimony over that of other witnesses, i.e. to the extent that the defendant failed resolve the facts in a manner satisfactory to Lapham to correct the record to eliminate the alleged false charges, such allegations of unfairness do not render the process constitutionally inadequate."); see also Hogan v. City of Fort Walton Beach, 817 F. App'x 717, 722 (11th Cir. 2020) ("Hogan's disciplinary appeal hearing was an adequate state remedy. As Hogan admitted in his complaint, he received notice of the basis for his termination. Moreover, Hogan admitted that he was permitted to (and indeed did) 'present facts and/or information' at the hearing. In other words, he was afforded an opportunity to present his case. Nothing more is required. While a post-deprivation hearing must be 'meaningful,' there is no requirement that the employee be permitted to ask questions." (citation omitted)).

Here, Mr. Puglia alleges he "was provided a name-clearing hearing" in the form of a name-clearing letter drafted by Mr. Puglia's counsel telling Mr. Puglia's "side of the story" — a method Mr. Puglia chose over an actual hearing.[2]

---

[2] While it could be argued that Mr. Puglia waived his right to a name-clearing hearing by electing to submit a name-

(Doc. # 47 at 21-22). This was sufficient process, even though "the HCSO took no further action and made no findings as to [Mr.] Puglia's defenses." (Id. at 22); see Medina v. City of Hialeah, No. 02-20957-CIV, 2003 WL 1562281, at *5 (S.D. Fla. Mar. 24, 2003) ("Plaintiff cannot voluntarily squander an opportunity for name-clearing and still blame the City for depriving him of a due process interest. Furthermore, the hearing is not a forum to adjudge guilt or innocence of the charges for which he was terminated — just to relate the other side of the story. Plaintiff seems to have confused the name-clearing hearing with a termination hearing regarding a due process deprivation of a property interest." (citation omitted)). The Court emphasizes that "the remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge'" — and that is exactly what Mr. Puglia was able to do in his name-clearing letter. Codd v. Velger, 429 U.S. 624, 627 (1977). The allegations that Defendants behaved in a bad faith manner towards Mr. Puglia by fabricating reports in his personnel file before his termination and that the Sheriff did not change his mind about

---

clearing letter into his personnel file instead of conducting a hearing, the Court will assume — as Mr. Puglia does — that the name-clearing letter was equivalent to a name-clearing hearing for the purposes of this Motion.

terminating Mr. Puglia based on the name-clearing letter do not plausibly support that Mr. Puglia was deprived of an opportunity to clear his name after his termination.

In short, the Court "agrees with Defendants that [this claim] is subject to dismissal because the allegations show that [Mr. Puglia] received a name-clearing hearing which is all that is required to protect his liberty interest under the Fourteenth Amendment's Due Process Clause." Hayden v. Ala. Dep't of Pub. Safety, 506 F. Supp. 2d 944, 954 (M.D. Ala. 2007). Because Mr. Puglia has already had an opportunity to amend this claim and the Court considers further amendment futile, Count II is dismissed with prejudice.

### C. **Qualified Immunity**

Finally, Defendants assert briefly at the beginning of the Motion's section regarding Count II that the liberty interest claim is also subject to dismissal based on qualified immunity.[3] (Doc. # 48 at 10). Then, in a subsequent footnote regarding only the due process liberty interest claim, they state: "Defendants will not reargue their contentions

---

[3] The Court notes that Defendants do not mention qualified immunity regarding Count I, the property interest claim, in their Motion. Thus, Defendants have not raised the defense of qualified immunity as to Count I — not even by their reincorporation of the arguments on qualified immunity from the previous motion to dismiss.

regarding the propriety of liberty interest damages under Section 1983 and qualified immunity since such arguments were presented in their original Motion to Dismiss []. Such prior arguments are reincorporated by reference herein." (Doc. # 48 at 10 n.8).

The Court is disappointed that Defendants failed to raise this argument in the body of their Motion. "Such incorporation by reference is improper, and it foists upon the Court the burden of sifting through irrelevant materials to find the materials referenced while permitting the movant to circumvent this Court's page limit requirement." Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC, 845 F. Supp. 2d 1241, 1253 (M.D. Fla. 2012), aff'd, 505 F. App'x 928 (11th Cir. 2013).

Nevertheless, the Court will consider the argument as to Count II. Mr. Puglia does not argue in his response that Defendants' reincorporation by footnote of its prior qualified immunity argument is inappropriate. Instead, he argues in his own footnote: "With respect to qualified immunity, the Amended Complaint addresses issues raised by the Defendants in their prior motion as to that issue, and therefore [Mr.] Puglia in turn incorporates by reference his arguments raised in response to Defendants' initial motion to

dismiss as to qualified immunity." (Doc. # 53 at 11 n.6). Furthermore, a true incorporation of the previous motion's qualified immunity argument and argument regarding liberty interest damages does not bring the instant Motion over the page limit set by Local Rule 3.01(a). See Local Rule 3.01(a), M.D. Fla. (setting a twenty-five-page limit for motions). Thus, the reincorporation by footnote is not an attempt by Defendants to end-run the page limit for this Motion. See Bryant v. Jones, No. 1:04-CV-2462WSD, 2006 WL 584762, at *6 (N.D. Ga. Mar. 10, 2006), as amended (Mar. 20, 2006) ("[W]hen a party incorporates by reference an entire section of another brief, it is the Court's position that the incorporated section should count against the 25-page and 15-page limits set out in Local Rule 7.1(D). In several instances, Defendants' incorporation of other brief sections in their initial briefs and reply briefs extend their briefs well beyond the page limits provided by Local Rule 7.1(D).").

On to the qualified immunity analysis, which provides an alternate basis for dismissal of Count II. Notably, the parties do not dispute that the individual Defendants were acting pursuant to their discretionary authority when the constitutional violation occurred. See Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) ("To invoke qualified

immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. The term 'discretionary authority' covers all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." (citations and internal quotation marks omitted)).

Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities unless their conduct violates a clearly established statutory or constitutional right. Brannon v. Finkelstein, 754 F.3d 1269, 1278 (11th Cir. 2014). "Assessing a claim of qualified immunity involves a two-step process: once a defendant raises the defense, the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation." Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010). Courts are "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." Id.

Here, the Court need only address the "clearly established" law prong. A right is clearly established when

it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Johnson v. City of Miami Beach, 18 F.4th 1267, 1273 (11th Cir. 2021) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). "The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or [the Eleventh Circuit] found a violation based on materially similar facts." Id. (citation omitted).

A "plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case." Waldron v. Spicher, 954 F.3d 1297, 1305 (11th Cir. 2020). "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. (citation omitted). That is, "in the light of pre-existing law, the unlawfulness must be apparent." Id. (citation omitted). "Third, a plaintiff could show that the case 'fits within the exception of conduct which so obviously violates [the] Constitution that prior case law is unnecessary.'" Id. (citation omitted). "This third test is a narrow category

encompassing those situations where 'the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law.'" Id. (citation omitted).

Even assuming for the sake of argument that Defendants' conduct was unconstitutional, Mr. Puglia has not carried his burden of establishing that the law rendering Defendants' actions unconstitutional was clearly established. Again, Mr. Puglia chose not to brief the qualified immunity issue in his response to the Motion. Rather, he reincorporated his previous arguments against qualified immunity from his response to the motion to dismiss the original complaint. See (Doc. # 53 at 11 n.6) ("With respect to qualified immunity, the Amended Complaint addresses issues raised by the Defendants in their prior motion as to that issue, and therefore Puglia in turn incorporates by reference his arguments raised in response to Defendants' initial motion to dismiss as to qualified immunity.").

This is perplexing given the Court's discussion of qualified immunity in its December 20, 2022 Order, in which the Court alternatively held that the Defendants were

entitled to qualified immunity on the First Amendment retaliation claim. In so holding, the Court wrote:

> The Court notes that, in his response to the Motion, Puglia fails to identify what case law he maintains "clearly establishes" that the individual Defendants' conduct violated his rights. Indeed, Puglia cites no case law at all in his discussion of whether it was clearly established that Defendants' actions were unconstitutional. (Doc. # 39 at 17-18). This failure to carry his burden also supports the grant of qualified immunity for the individual Defendants. See Villagrana v. Vill. of Oswego, No. 04 C 4603, 2005 WL 217033, at *4 (N.D. Ill. Jan. 28, 2005) ("Villagrana cites no 'closely correspond[ing]' case law suggesting that Johnson's actions violated his clearly established rights to familial privacy; indeed, he cites no case law at all. Though it is unnecessary for the plaintiff to specifically cite the legal basis for his claim in his pleading so as long as the facts alleged would support relief, when a plaintiff responds to a motion to dismiss that raises a qualified immunity defense, the plaintiff bears the burden of proving the existence of a clearly established right. Villagrana has failed to do so. Thus, his family privacy claim is dismissed." (citations omitted)); Walker v. City of Orem, 451 F.3d 1139, 1151 (10th Cir. 2006) ("Plaintiffs had the burden, in response to defendants' motion to dismiss, of articulating such clearly-established law.").

(Doc. # 45 at 30 n.3).

Thus, Mr. Puglia was well aware that his response to the motion to dismiss the original complaint, which made no effort to cite law clearly establishing the constitutional rights he alleges were violated, was wholly insufficient to defeat Defendants' claim to qualified immunity. Yet, Mr. Puglia has

chosen to cursorily reincorporate through a footnote that insufficient prior response as his only defense to Defendants' claim of qualified immunity here.

In short, Mr. Puglia has not met his burden of establishing that the law rendering Defendants' actions unconstitutional was already clearly established at the time of the alleged due process liberty interest violation. Defendants Kenneth Hayden, Philip Lakin, Scott Reak, John Ellis, William Hillman, and Joseph McClennan, as well as Sheriff Nienhuis to the extent he is sued individually, are alternatively entitled to qualified immunity on Count II of the amended complaint.

## IV.   **Conclusion**

The case will proceed as to Count I, the property interest claim. But Count II, the liberty interest claim, is dismissed with prejudice.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Sheriff Alvin Nienhuis, Kenneth Hayden, Philip Lakin, Scott Reak, John Ellis, William Hillman, and Joseph McClennan's Motion to Dismiss Amended Complaint (Doc. # 48) is **GRANTED** in part and **DENIED** in part.

(2)   Count II is dismissed with prejudice.

(3)   Defendants' answer to Count I of the amended complaint
is due 14 days from the date of this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this
<u>31st</u> day of March, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE