UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW PUGLIA,

      Plaintiff,

v.                                    Case No. 8:22-cv-1954-VMC-CPT

ALVIN NIENHUIS, individually
and in his official capacity
as Sheriff of Hernando
County, Florida; KENNETH HAYDEN;
PHILIP LAKIN; SCOTT REAK;
JOHN ELLIS; WILLIAM HILLMAN;
and JOSEPH McCLENNAN,

      Defendants.
_____/

**ORDER**

This matter is before the Court on consideration of Defendant Sheriff Alvin Nienhuis, Kenneth Hayden, Philip Lakin, Scott Reak, John Ellis, William Hillman, and Joseph McClennan's Motion for Summary Judgment (Doc. # 80), filed on January 20, 2023. Plaintiff Matthew Puglia responded on October 20, 2023. (Doc. # 100). Defendants replied on November 3, 2023. (Doc. # 107). The Motion is granted.

I.   **Background**

The parties in their respective statements of material facts include numerous facts and details about Puglia's time with the Hernando County Sheriff's Office ("HCSO"). The Court

1

has reviewed those statements of material fact in their entirety; however, the Court will outline here only those facts necessary to resolve the instant Motion.

**A.   Defendants**

Defendant Sheriff Alvin Nienhuis serves as the duly elected Sheriff of Hernando County, Florida and at all times served as Sheriff during Puglia's employment. (Doc. # 57 at ¶¶ 5-6).

Defendant Kenneth Hayden is currently the Chief Deputy for the HCSO with the rank of Colonel. During Puglia's employment and prior to being promoted to his current rank, Hayden served as the Commander of the agency's Law Enforcement Operations Bureau ("LEO Bureau") with the rank of Major. (Doc. # 81 at 6:2-7:1, 7:22-25). The HCSO's LEO Bureau includes the agency's Patrol Division. (Id. at 8:1-9).

Defendant Philip Lakin is currently employed as the Commander of the LEO Bureau for the HCSO. (Doc. # 57 at ¶ 9; Doc. # 82 at 6:17-21, 9:4-6, 66:20-24). Prior to being promoted to his current rank of Major and during all relevant times, Lakin was a Captain overseeing the HCSO's Patrol Division and reporting directly to then-Major Hayden. (Doc. # 82 at 7:22-8:4).

2

Non-party Rocky Howard is currently in charge of the Office of Professional Standards for the HCSO, serving with the rank of Lieutenant. Prior to transferring to Professional Standards and during all relevant times, Howard was the Patrol Division's District 2 Commander, reporting to then-Captain Lakin. (Doc. # 83 at 8:1-10).

Defendant William Hillman is currently employed by the HCSO, holding the rank of Sergeant since 2014. (Doc. # 84 at 7:2-9). Beginning in February 2021, Sergeant Hillman worked in Patrol District 2 under the supervision of Howard. (Id. at 10:5-8).

Defendant John Ellis is currently employed by the HCSO as a Sergeant in the Major Case Section of the Criminal Investigation Division ("CID"), supervising detectives who work cases involving crimes against persons. (Doc. # 85 at 4:13-23, 5:5-8). Prior to transferring to the CID, Ellis was a District 2 Patrol Division supervisor, reporting to Howard. (Id. at 20:21 - 21:7).

Defendant Scott Reak is currently employed by the HCSO as a Lieutenant in charge of the agency's Vice and Narcotics Unit. (Doc. # 86 at 10:14-17). After being promoted to Lieutenant in April 2021, Reak initially served as the Patrol

3

Division's Night Watch Commander before being reassigned to Special Operations for seven or eight months and eventually to the Vice and Narcotics Unit. (Id. at 10:11-13, 12:11-22, 13:1-4). As Night Watch Commander, Reak was a lieutenant in Puglia's chain of command. (Id. at 16:13-17:25).

Defendant Joseph McClellan[1] was employed with the HCSO as a deputy sheriff from June 2019 until his resignation in May 2023. (Doc. # 87 at 11:6-9, 21:24-22:1). During his employment, McClellan was assigned to Patrol Division District 2 and, during certain periods, was directly supervised by Hillman and Ellis. (Id. at 16:13-23; Doc. # 84 at 15:16-16:2).

B. **Puglia's Employment**

Puglia is a former deputy sheriff who was hired on July 6, 2020, and dismissed on December 8, 2021. (Doc. # 47 at ¶¶ 14, 59). The parties disagree over whether Puglia was a probationary employee at the time of his termination.

Puglia began his employment with the HCSO on an initial 12-month probationary period. (Doc. # 88 at 50:17-51:17) During that time, he was responsible for completing initial

_____

[1] Although Puglia named this Defendant as Joseph McClennan in the amended complaint, the proper spelling is McClellan. (Doc. # 87 at 6:13-20).

4

on-the-job training through the HCSO's Field Training Officer ("FTO") Program. (Id.).

Probationary employees do not have career service status under the Hernando County Career Service Act or HCSO's general orders. See Ch. 2000-414, § 5(a), Laws of Fla. (also called "HB 1441"); (Doc. # 82 at 51:3-24); see also (Doc. # 82-4 at § IV) (HCSO General Order 1200 defining "career-service status" as "[a]ny employee that has served for one (1) calendar year and has not been placed on extended probation during that period."). "An employee that is placed on extended probation during the initial year of employment attains career service status upon the successful completion of the extended probation." (Doc. # 82-4 at § IV).

Regarding probation, the HCSO's Rule III – Appointment provides in relevant part:

> Any new or promotional appointment shall be a probationary appointment subject to the completion of a satisfactory probationary period. **The probationary period shall be utilized to evaluate the employee's performance on the job and for dismissing those who do not meet the required standards of performance**. The duration of such probationary period shall be one (1) year from date of appointment with no interruptions in service for new appointments, and six months for promotional appointments. **The Sheriff reserves the right to extend the probationary period.**

(Doc. # 83-5 at 1) (emphasis added).

5

The HCSO's field training program typically lasts 12-16 weeks and commences a few weeks after a deputy's initial hire. (Doc. # 85 at 18:5-7; Doc. # 85-2; Doc. # 86 at 38:18-19). During training, Puglia's least acceptable performance was in report writing. (Doc. # 81-5 at pp. 519, 528, 539, 544, 549, 600, 605). Puglia was provided with remedial Phase 4 training in light of his struggles. (Id. at p. 611; Doc. # 88 at 51:9-25). Puglia subsequently completed his field training program and began working shifts as a deputy.

### C.   Continued Issues and Probation Extensions

While working shifts in Patrol Division District 2, Puglia was directly supervised by Sergeants Hillman and Ellis. (Doc. # 84 at 25:6-8; Doc. # 85 at 9:25-10:17). During this time, Puglia's District 2 supervisors also included Lieutenants Reak (Night Watch Commander) and Howard (District Commander), then-Captain Lakin (Patrol Division Commander), and then-Major Hayden (Law Enforcement Operations Bureau Commander). Individually and collectively, these supervisors observed and discussed the difficulties Puglia was still having with an abnormally high rejection rate for his written reports. (Doc. # 86 at 57:7-58:7).

Steps were taken to help Puglia improve his report writing. Puglia's improvement plan had many components, including the extension of his initial 12-month probationary period. (Doc. # 86-2 at p. 8). Puglia was given a "Dragon Speak" device to help him draft his reports. (Id. at p. 12; Doc. # 88 at 121:23-122:13; Doc. # 88-22 at p. 12). He was also given access to online Fred Pryor training courses (Doc. # 85 at 24:22-25:2), links to report templates for various types of crimes (Doc. # 86-2 at pp. 15-16), and articles on report writing (Doc. # 86-5), among other things.

On June 8, 2021, Lt. Reak issued Puglia an Employee Interview Report ("EIR") that addressed Puglia's poor report writing and missing a traffic court appearance. (Doc. # 86-2 at p. 2). EIRs are considered educational in nature, rather than punitive, and are used at the HCSO to document verbal discussions between the supervisor and his or her employee. (Doc. # 89-2 at § V(A)).

On June 14, 2021, then-Major Hayden recommended that Puglia's initial probationary period be extended for three additional months. (Doc. # 81-4). Colonel Turney accepted Hayden's recommendation and extended Puglia's probationary period for the first time from July 6 to October 5, 2021.

7

(Doc. # 81-5 at p. 301). Puglia was notified of this first extension of his initial probationary period on June 16, 2021. (Doc. # 86-2 at p. 4).

On or about July 24, 2021, Puglia completed his Self-Evaluation Questionnaire regarding his performance as a deputy sheriff for the period of July 6, 2020, through July 5, 2021. (Doc. # 88 at 84:8-13). Therein, Puglia acknowledged "written communications" as one of three areas he most sought to improve, explaining that he would like to improve his "report writing skills" as well as his "grammar" and "spelling." (Doc. # 88-13 at p. 2).

Sergeant Ellis reviewed Puglia's responses to his Self-Evaluation Questionnaire with Puglia during his annual performance evaluation. (Doc. # 88-14 at p. 6). For Puglia's initial rating period of July 6, 2020, to July 5, 2021, Ellis assessed Puglia's Professional Growth and Development, Written Communications, and Work Quality as "Unacceptable" — the lowest possible rating. (Id. at pp. 1-3).

After being directed to provide a written response to specific questions by then-Captain Lakin, Puglia authored a two-page memorandum. (Doc. # 88 at 106:17-22, 108:15-25; Doc. # 88-15). In relevant part and with respect to the critical

assessments of Puglia's performance in his annual performance evaluation, Puglia wrote:

> Shortly after I returned to work, Sergeant Ellis gave me my review. To say the least, it was not something that I enjoyed reading, but it was correct for what I had going on at that time in my life. It was accurate, and I take responsibility.

(Doc. # 88 at 104:13-105:17; Doc. # 88-15 at p. 1). At his deposition, Puglia confirmed that all statements made in his September 19, 2021, memorandum were true and accurate. (Doc. # 88 at 105:5-17).

By mid-September 2021, Puglia's performance as a probationary deputy sheriff had not substantially improved. (Doc. # 81-5 at p. 291). Specifically, following completion of the field training program and from December 6, 2020, through September 21, 2021, 196 of Puglia's 378 authored reports, supplements, and other ACISS entries had been rejected — a rejection rate of 52%. (Id.). That said, in the month of September 2021 alone, Puglia's rejection rate for reports had decreased to 35%, which was "still far above the rate of his shift." (Id. at p. 290). Recognizing his ongoing deficiencies, Puglia authored a memorandum dated September 19, 2021, wherein he disclosed personal challenges resulting in absences from work that he surmised may have negatively impacted his attention to detail. (Id. at pp. 299-300).

9

On September 22, 2021, due to Puglia's continued performance issues and absences from scheduled patrol shift work, then-Captain Lakin prepared a memorandum to Colonel Turney recommending an extension of Puglia's probationary period for another thirty days (from October 5, 2021, through November 5, 2021). (Id. at pp. 287-290; Doc. # 81-7 at pp. 1-4; Doc. # 82 at 36:14-33, 38:12-19). Colonel Turney approved Lakin's recommendation on September 24, 2021. (Doc. # 81-5 at pp. 287-290). Puglia received email notification of the extension of his probationary period through November 5, 2021, the same day. (Doc. # 88 at 109:20-25, 110:1-17; Doc. # 88-17).

D.   **Investigation, Final Extension, and Termination**

Ellis and Reak testified that, during this time, they noticed differences in Puglia's written reports which raised concerns over whether someone else was writing Puglia's reports for him. (Doc. # 85 at 36:5-37:19; Doc. # 86 at 84:22-85:11).

A subsequent internal check of Puglia's work address e-mails showed that Puglia had been forwarding his draft written reports and confidential criminal computer-aided dispatch records to his home e-mail address and to the addresses of

third parties outside of the HCSO. (Doc. # 81-5 at pp. 613-
865; Doc. # 88 at 110:22-111:21; Doc. # 88-18). The third
parties included Francis Ritchie (a former HCSO deputy) and
Joseph Puglia, Puglia's father who was a certified law
enforcement officer but who did not work for the HCSO. (Doc.
# 81-5 at pp. 17-26).

Out of a concern that Puglia's sharing of confidential
criminal data outside of the agency might be a violation of
law or HCSO General Orders, the HCSO referred Puglia's
potential violations of criminal statutes to the State
Attorney's Office and placed Puglia on administrative leave
with pay effective October 29, 2021. (Doc. # 88 at 113:8-16).
The outside investigators determined that no crime had
occurred but referred the investigation to Internal Affairs
to investigate HCSO policy violations. (Doc. # 84-9).

Puglia testified that, during his paid administrative
leave, he was precluded from working any assigned shifts as
a deputy sheriff. (Doc. # 88 at 115:4-25). But his notice of
administrative leave stated that he "was subject to immediate
recall" with one hour's notice. (Doc. # 81-19).

The HCSO initiated an internal investigation on November
4, 2021, into Puglia's conduct for possible violation of

General Order 2025.00, Internet and Electronic Communication (Doc. # 81-5 at pp. 269-279), and Policy Statement 1023.00, Code of Conduct (Id. at pp. 280-285; Doc. # 89 at ¶ 6).

While on paid administrative leave and considering the Internal Affairs investigation, Sheriff Nienhuis extended Puglia's initial probationary period for a third time from November 5, 2021, to November 30, 2021. (Doc. # 49 at ¶¶ 4-9, Ex. 1; Doc. # 88 at 113:17-114:21; Doc. # 88-19). Sheriff Nienhuis's written notice to Puglia extending his probationary status through November 30, 2021, was served on Puglia by Lt. Howard on November 2, 2021. (Doc. # 49 at ¶ 9). The notice identifies the grounds for the further extension of Puglia's probationary status as being both the Internal Affairs investigation and the continued "evaluation of [his] performance as a deputy sheriff." (Id. at ¶ 4, Ex. 1).

Subsequently, then-Major Hayden drafted an Interoffice Memorandum to then-Captain Lakin dated November 29, 2021, that states:

> After reviewing the documentation in regards to Deputy Matthew Puglia's progress thus far, I concur that a probation extension needs to be provided.
>
> **Deputy Puglia's probation period will be extended through December 18, 2021.**
>
> Should you feel he's up to standards prior to that date, we can adjust the period.

12

(Doc. # 49 at Ex. 4) (emphasis added). This was the fourth extension of Puglia's probationary period. According to his affidavit, Hayden "authorized [this] fourth extension of Puglia's initial probation on November 29, 2021, due to the fact that as of that date, the Internal Affairs investigation had not yet been completed and without the additional extension, Puglia's initial probation potentially was scheduled to expire on November 30, 2021, and Colonel Turney was not actively working as he approached his date of retirement." (Doc. # 89 at ¶ 7).

Then-Major Hayden, who was a bureau commander, had the authority to extend Puglia's probationary period for up to three months, without obtaining the Sheriff's approval. (Id.). He had such authority because the HCSO's General Order 3065.00 provides that a "bureau commander may place an employee on disciplinary probation for a period of 3 months to 1 year. Disciplinary probation recommendations that exceed 3 months must be submitted by the appropriate Bureau Commander (in writing) to the Sheriff for approval prior to being imposed." (Doc. # 105-4 at 6). Although the General Order makes clear the authority of a bureau commander to extend probation, Hayden testified during his deposition that he was

13

"not aware of a policy that expressly delegates the authority to extend a probation." (Doc. # 81 at 144:19-145:2).

Puglia seems to doubt the authenticity of Hayden's memorandum extending his probation, pointing out that Lakin (to whom the memorandum was addressed) testified that he was not involved in the Internal Affairs investigation or Puglia's termination process. Lakin was not at HCSO at the time of Puglia's termination on December 8 because he was away at the Command Officers Development Course, which required him to be "away for two weeks a month for five months." (Doc. # 82 at 16:13-24; 26:23-27:5; 55:17-22). But no evidence shows that Hayden did not draft this memorandum on November 29, 2021, as dated.

Indeed, Lt. Howard averred in his affidavit that "[o]n November 30, 2021, [he] received an email from Sergeant Dustin Adkins with regard to another probation extension to be served upon Deputy M Puglia." (Doc. # 49 at ¶ 10 & Ex. 6). The email from Adkins stated, "Hey LT, attached is the memo regarding Puglia's probation extension." (Id. at Ex. 6). The November 29 memo from Hayden to Lakin extending Puglia's probation was "attached to this email." (Id. at ¶ 10 & Ex. 4).

14

Lt. Howard avers that he served the memo extending Puglia's probation for the fourth time on Puglia on November 30, 2021. (Id. at ¶¶ 11-15). After serving the memo on Puglia, Howard "then walked back into [his] office and immediately sent an email to Sergeant Dustin Adkins and Lieutenant John McMurdo that read 'Gentlemen, Deputy Puglia has been served.' This was to inform them that Puglia was given the memo extending his probation." (Id. at ¶ 16 & Ex. 6).

For his Part, Puglia swears in his affidavit that he has "no recollection of being served with any extension of probation on November 30, 2021." (Doc. # 54 at ¶ 7). He also points out that there is no document in the record that is signed by him and acknowledges receipt of the final probation extension document.

On December 7, 2021, Puglia's Internal Affairs investigation was completed with sustained findings of the asserted violations by the Internal Affairs Investigator and concurred with by Lieutenant John McMurdo. See (Doc. # 81-5 at pp. 1-13) (including an Interoffice Memorandum from Internal Affairs Investigator Stephens dated December 7, 2021, stating "Internal Affairs Investigation, case number 2021-IA-10 has been prepared and presented for your review"

15

and including "findings" that Puglia had violated General Order 2025.00, Internet and Electronic Communications, and Policy Statement 1023.00, Code of Conduct, Unsatisfactory Performance).

Then-Major Hayden recommended to Sheriff Nienhuis that Puglia be terminated from his employment for Puglia's substandard performance as a probationary deputy in a memorandum dated December 8, 2021. (Doc. # 81 at 132:19-133:1-7; Doc. # 81-23). The memorandum stated in part that Puglia "is unable to perform the routine tasks assigned to him on a work shift basis." (Doc. # 81-23). Hayden testified that, in making this recommendation, he relied on the documentation created by then-Captain Lakin, Lt. Howard, and Sgts. Hillman and Ellis. (Doc. # 81 at 134:7-13).

Puglia's initial probation was extended four times (Doc. # 81 at 24:3-6), although Hayden's memorandum to Sheriff Nienhuis erroneously cites to only two extensions because he had lost track of the number of extensions when he authored the termination recommendation. (Id. at 135:4-12).

Through issuing a letter to Puglia terminating his employment on December 8, 2021, Sheriff Nienhuis notified Puglia that he was being terminated for his failure to achieve

16

and maintain the standards set to remain a deputy sheriff. The letter further informed Puglia that as a probationary employee, he was not being afforded the rights of the Career Service appeal process as outlined in General Order 3065.00 – Disciplinary Procedure. (Doc. # 50 at ¶ 3, Ex. 1).

On December 8, 2021, then-Major Hayden authored an Interoffice Memorandum closing Internal Investigation 2021-IA-03 and noting: "Action Taken: Probationary employee terminated prior to discipline." (Doc. # 81 at 123:2-124:25; Doc. # 81-5 at p. 1). That interoffice memorandum read in full:

> Internal Affairs Investigation 2021-IA-10 was initiated November 4, 2021, in regards to alleged misconduct by Deputy Matthew Puglia. The allegations named in the investigation are as follows:
>
> Violation of General Order 2025.00, Internet and Electronic Mail Usage - SUSTAINED
>
> Violation of Policy Statement 1023.00 Code of Conduct - Unsatisfactory Performance SUSTAINED
>
> On December 8, 2021 Deputy Puglia was terminated from the Hernando County Sheriff's Office for failure to meet the standards of a Hernando County Deputy Sheriff.
>
> Action Taken: Probationary employee terminated prior to discipline
>
> Case Status: Closed

17

(Doc. # 81-5 at p. 1). Despite this document from December 8, 2021, there is also an Interoffice Memorandum by Investigator Stephens from December 22, 2021, stating that the investigation was closed on December 21, 2021. (Doc. # 105-8 at 4, 6).

On December 8, 2021, Puglia's then-counsel, Michael Day, sent Sheriff Nienhuis a letter stating in relevant part: "My client is currently on 'probation' and Florida is a 'right to work' state," though Day "[felt] that [Puglia's] original probationary period was recently improperly extended several times." (Doc. # 89 at ¶ 8; Doc. # 89-3 at pp. 1-2). In his declaration, Day averred that "[t]he purpose of the quotation marks [around the word probation] was to convey sarcasm and in no way was it my intent to communicate or admit that [] Puglia was a probationary employee as of December 8, 2021." (Doc. # 102).

Puglia's probationary status was separately acknowledged by his union, the Fraternal Order of Police. (Doc. # 88-26). The minutes from the Fraternal Order of Police's December 16, 2021, Emergency Executive Board Meeting state that Puglia "was still on new-hire probation at the time he was terminated." (Id. at 1). Although the Fraternal Order of

Police officially agreed with Sheriff Nienhuis that Puglia was a probationary employee, not all members of the Fraternal Order of Police agreed. Puglia's Fraternal Order of Police Representative, Steve Klapka, averred that he "did not believe that [] Puglia was a probationary employee at the time of his termination." (Doc. # 103 at ¶ 13). Klapka left a voicemail for Hayden "request[ing] that [Puglia] be given a pre-termination hearing, and a post-termination hearing." (Id.).

### E.   **Procedural History**

Thereafter, Mr. Puglia initiated this Section 1983 action. (Doc. # 1). The Court dismissed Mr. Puglia's First Amendment retaliation and due process liberty interest claims. (Doc. # 45; Doc. # 56). Thus, only Mr. Puglia's due process property interest claim remains.

Now, Defendants move for summary judgment on that claim. (Doc. # 80). Mr. Puglia has responded (Doc. # 100), and Defendants have replied. (Doc. # 107). At the Court's request, the parties filed supplemental briefs concerning adequate state remedies. (Doc. ## 111, 112). The Motion is ripe for review.

## II.  **Legal Standard**

19

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

Defendants argue that summary judgment is proper because there is no genuine dispute of material fact as to two elements of Puglia's procedural due process claim. Additionally, they argue that all Defendants, to the extent they are sued in their individual capacities and were acting within their discretionary authority, are entitled to qualified immunity.

"Assessing a claim of qualified immunity involves a two-step process: once a defendant raises the defense, the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation." Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010). Importantly, courts are "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." Id. Because the Court determines that there was no constitutional violation as a matter of law, Defendants are entitled to qualified immunity and Puglia's claim fails on the merits.

The Court addresses the two flaws with Puglia's procedural due process claim separately below.

**A.    <u>Was Puglia on Probation When Terminated?</u>**

The Fourteenth Amendment prohibits states from depriving anyone of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process rules are not meant to protect persons from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." <u>Carey v. Piphus</u>, 435 U.S. 247, 259 (1978). "To prevail on a procedural due process claim, Plaintiff must establish: (1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation." <u>Lacy v. City of St. Petersburg</u>, No. 8:14-cv-252-VMC-TGW, 2014 WL 4376201, at *5 (M.D. Fla. Sept. 4, 2014) (citing <u>Bank of Jackson Cnty. v. Cherry</u>, 980 F.2d 1362, 1366 (11th Cir. 1993)), <u>aff'd</u>, 608 F. App'x 911 (11th Cir. 2015). "The essential elements of procedural due process are notice and an opportunity to be heard before one is deprived of a protected interest." <u>Id.</u>

"Because deputy sheriffs are not employees and both their selection and retention come under the absolute control of the sheriff, courts have held that Florida deputy sheriffs

have no property or liberty interests in their positions for purposes of the Fourteenth Amendment." Stough v. Gallagher, 967 F.2d 1523, 1530 (11th Cir. 1992); see also Fla. Stat. § 30.079 ("The provisions of this act shall not be construed to provide deputy sheriffs with a property interest or expectancy of continued appointment as a deputy sheriff, nor shall these provisions serve as a limitation of the sheriff's authority . . . to exercise control and discretion over the organization and operations of the sheriff's office or department."). A "limited exception provides that deputy sheriffs can hold a property interest in their employment pursuant to a career civil service system." Wicher v. Osceola Cnty. Sheriff's Off., No. 6:10-cv-1072-ACC-GJK, 2011 WL 13136514, at *4 (M.D. Fla. Sept. 16, 2011), aff'd, 503 F. App'x 732 (11th Cir. 2013).

The Court agrees with Defendants that there is no genuine dispute of material fact as to whether Puglia had a property interest in his employment under the HCSO's civil service system. Puglia was on probation on December 8, 2022, when his employment was terminated, and thus had no property interest.

As a preliminary matter, then-Major Hayden's affidavit is not a sham affidavit. While Hayden could not remember at

the time of his deposition what policy delegated the authority to extend a deputy's probation to him (Doc. # 81 at 144:19-145:2), such lapse of memory at that time does not preclude Hayden's subsequent recollection and inclusion of those facts in his affidavit. See Poitevint v. United Recovery Sys., LP, 899 F. Supp. 2d 1230, 1235 (N.D. Fla. 2012) (explaining that "the 'sham affidavit' rule provides that an affidavit can be disregarded if its conflict with other evidence in the case is so pronounced that the affidavit rises to the level of a sham" and "[g]enerally, discrepancies between a witness's affidavit and deposition do not defeat the admissibility of the affidavit"). "To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). There is no inherent inconsistency between Hayden's lack of awareness of the General Order during his deposition and his subsequent awareness and explanation of that General Order in his affidavit. See Id. at 951 (finding that an affidavit was not a sham because the court did "not find the original affidavit inherently inconsistent with the deposition").

Thus, then-Major Hayden's affidavit will be considered by the Court. That affidavit explains that Hayden "authorized [this] fourth extension of Puglia's initial probation on November 29, 2021, due to the fact that as of that date, the Internal Affairs investigation had not yet been completed and without the additional extension, Puglia's initial probation potentially was scheduled to expire on November 30, 2021, and Colonel Turney was not actively working as he approached his date of retirement." (Doc. # 89 at ¶ 7). He identified the source of his authority to extend Puglia's probation as General Order 3065.00. (Id.). Indeed, General Order 3065.00 provides that a "bureau commander may place an employee on disciplinary probation for a period of 3 months to 1 year. Disciplinary probation recommendations that exceed 3 months must be submitted by the appropriate Bureau Commander (in writing) to the Sheriff for approval prior to being imposed." (Doc. # 105-4 at 6). Thus, a bureau commander may extend a probationary period by up to 3 months without obtaining the Sheriff's approval.

In his response, Puglia argues that the fourth probation extension under General Order 3065.00 is invalid because that General Order involves "disciplinary probation" and

26

"[n]owhere in the record is there any evidence or suggestion that Puglia's probation was extended for disciplinary purposes." (Doc. # 100 at 15). The Court is unpersuaded. While Puglia's termination was not based on disciplinary violations, it is inaccurate to suggest that there was no disciplinary reason for the fourth extension of Puglia's probation. When Hayden as bureau commander extended Puglia's probation for the final time, Puglia was out on administrative leave pending completion of the Internal Affairs investigation into his misconduct. (Doc. # 88 at 113:8-16). The ongoing investigation was the reason identified by Hayden for the fourth probation extension. (Doc. # 89 at ¶ 7). The Internal Affairs investigation ultimately concluded that Puglia did violate General Order 2025.00, Internet and Electronic Communications, and Policy Statement 1023.00, Code of Conduct, Unsatisfactory Performance. (Doc. # 81-5 at pp. 1-13).

Even setting aside that Puglia was being investigated for disciplinary violations when his probation was extended for the fourth time, Puglia was also having issues with his performance at the time of the fourth extension; indeed, the second extension of his probation was related to the continued

report writing problems and the third extension was because of "the ongoing [Internal Affairs] investigation and the evaluation of [Puglia's] performance." (Doc. # 49 at Ex. 1; Doc. # 81-5 at p. 287-91). General Order 3065.00 explains that "[d]iscipline is a function of command that must be exercised in order to develop a staff obedient to direction and control" but "discipline can also be thought of as a form of training and a constructive tool of leadership used to eliminate operational weaknesses." (Doc. # 105-4 at 3).

Finally, the fact that Puglia does not recall receiving a copy of the memorandum extending his probation for the fourth and final time does not create a genuine issue of material fact as to whether he was on probation at the time. See Dickey v. Baptist Mem'l Hosp.-N. Miss., 146 F.3d 262, 266 n.1 (5th Cir. 1998) (noting that a witness's failure to recall that a telephone conversation occurred did not create a genuine dispute with the other speaker's testimony that the conversation actually occurred); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983) (finding summary judgment proper where defendant's evidence indicated that ADEA notice was posted and plaintiff's affidavit stated only that he did not recall seeing one). "[W]here the only evidence negating the

28

existence of an event is a witness's failure to remember that event, other courts have declined to find a genuine issue of fact for summary judgment purposes." Linao v. GCR Tire Ctrs., No. 2:09-CV-134-RWS, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010); see also Torjagbo v. United States, 285 F. App'x 615, 619 (11th Cir. 2008) (noting that although Torjagbo testified that he did not remember signing the covenant not to sue, a reasonable jury could not find in his favor on the authenticity of the covenant); Chandler v. James, 985 F. Supp. 1094, 1100 (M.D. Ala. 1997) ("[A] witness who states that he cannot remember whether or not an event alleged to have happened by the moving party actually took place does not help the nonmoving party to meet its burden."). Puglia's lack of memory does not rebut the significant evidence that the memorandum extending his probation was drafted on November 29 and served on Puglia by Lt. Howard on November 30, 2021. Howard's affidavit swearing that he served the memorandum on Puglia is corroborated by the email sent to him by Adkins with the memorandum attached and Howard's email back to Adkins the same day stating that Howard had just served Puglia. (Doc. # 49 at ¶¶ 10-16, Ex. 4, & Ex. 6).

In short, Puglia has not established a genuine dispute as to whether he was a civil service — rather than probationary — employee at the time of his termination.[2] While Puglia disagrees that his probation was extended or that any extension was appropriate, there is insufficient evidence to rebut that Puglia's probationary status was extended by the HCSO to December 18, 2021 — a date after his December 8 termination. Thus, as a matter of law, Puglia did not have a property interest in continued employment and his due process claim fails.

Summary judgment in Defendants' favor is warranted on this basis alone. But the Court will also address Defendants' alternative argument regarding adequate state remedies.

B.  **Were There Adequate State Remedies?**

---

[2] The Court need not engage in much discussion of Fla. Stat. § 30.073(2)(c). See Fla. Stat. § 30.073(2)(c) ("If a deputy sheriff is unable to perform the duties and responsibilities of the position to which he or she is appointed or promoted due to a nonservice-connected disability or other justifiable cause, the period of probation may be extended by the amount of time the deputy sheriff is unable to perform his or her duties."). Puglia's brief reference to this statute is unpersuasive. (Doc. # 100 at 15-16). This statute does not preclude a sheriff from extending a deputy's probationary period based on that deputy's poor performance or other issues. Thus, this statute does not support that the HCSO's multiple extensions of Puglia's probation were invalid such that Puglia's probationary status should be ignored.

Although summary judgment is warranted based on the probationary status issue, the Court will also alternatively address whether there were adequate state remedies available to Puglia. In performing this alternative analysis, the Court will assume that Puglia was a career-service employee at the time of his termination, as Puglia argues.

"[E]ven if [a] plaintiff establishes a property interest in [his] employment, to state a cause of action for a violation of procedural due process [he] must also establish that there was no state remedy for [his] termination. This is not an affirmative defense, but an element of the cause of action." Laney v. Hosp. Bd. of Dirs. of Lee Cnty., No. 2:09-cv-678-JES-SPC, 2010 WL 5161367, at *7 (M.D. Fla. Dec. 14, 2010). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994). "[T]his directive is a recognition that procedural due process violations do not even exist unless no adequate state remedies are available." Cotton v. Jackson, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000).

31

Defendants argue that, "[r]egardless of [Puglia's] probationary status, [Puglia's] procedural due process claim fails because such a claim does not exist where, as here, Florida law provides an adequate state remedy." (Doc. # 80 at 22). According to Defendants, "to the extent [Puglia] argues he was denied due process in the form of a career service hearing based on the position he was not a probationary employee, [Puglia] could have attempted to avail himself of this process and, if unsuccessful, moved for mandamus or certiorari relief in circuit court." (Id.).

The Court agrees with Defendants. Here, assuming that Puglia was a civil service employee as he maintains, Puglia had an established legal right to have a termination appeal hearing before a Career Services Appeal Board. The Hernando County Sheriff's Office General Order 1200 provides that "[a] Career Services Appeal Board shall be created for the purpose of hearing appeals of career-service employees arising from disciplinary dismissals or suspensions that exceed fifteen (15) days." (Doc. # 82-4 at 2). "The Board **shall** hear appeals related to the disciplinary dismissal or suspension in excess of fifteen (15) days of a career-service status employee." (Id. at 3) (emphasis added).

32

Indeed, Puglia concedes that "an adequate remedy was provided by H.B. No. 1441 with its provision providing for an appeal to the Career Service Appeals Board." (Doc. # 100 at 19). But Puglia did not submit a written request to appeal his dismissal to the Career Services Appeal Board because he had been told that he — as a probationary employee — was not entitled to such an appeal. But this is not convincing. Again, according to Puglia, he and his then-counsel believed at the time of his termination that he was a career-service employee entitled to a termination appeal hearing before a Career Services Appeal Board. See (Doc. # 102) (then-counsel's affidavit that he was being sarcastic when he referred to Puglia as a probationary employee); (Doc. # 103 at ¶ 13) (Fraternal Order of Police Representative Klapka's affidavit that he believed Puglia was a career-service employee at the time of his termination). Thus, despite the HCSO's statement that Puglia was a probationary employee, Puglia could have filed for a termination appeal hearing before the Career Services Appeal Board.

Even assuming that any request from Puglia for such an appeal would have been denied by the HCSO based on his alleged probationary status, Puglia had another adequate state remedy

available to him. Puglia could then have sought mandamus relief in state court. See Rowan v. City of Avon Park, No. 2:12-CV-14077-KMM, 2012 WL 2872300, at *5 (S.D. Fla. July 12, 2012) ("Not unlike the plaintiff in Cotton, Plaintiff also had available the judicial remedy of mandamus. . . . Here, Plaintiff possessed a clear legal right, by virtue of the City Charter, to 'a final appeal before the City Council [consistent with due process of law] for purposes of contesting any removal.' The Charter affords Defendant no discretion with respect to whether Plaintiff is entitled to such a hearing. Consequently, an adequate state remedy was available and plaintiff cannot rely on his failure to avail himself of that remedy to claim he was deprived of procedural due process." (citation omitted)). "In order to be entitled to a writ of mandamus, the petitioner must have a clear legal right to the requested relief, the respondent must have an indisputable legal duty to perform the requested action, and the petitioner must have no other adequate remedy available." Fla. Agency for Health Care Admin. v. Zuckerman Spaeder, LLP, 221 So. 3d 1260, 1263 (Fla. 1st DCA 2017) (quoting Putnam Cnty. Env't Council v. Johns River Water Mgmt. Dist., 168 So.3d 296, 298 (Fla. 1st DCA 2015)). "The duty of the

respondent in a mandamus action must be ministerial in nature, and not discretionary." Id. "A duty is ministerial when 'there is no room for the exercise of discretion, and the performance being required is directed by law.'" Id. (quoting Town of Manalapan v. Rechler, 674 So.2d 789, 790 (Fla. 4th DCA 1996)). "Mandamus is available only to enforce an established legal right, not to establish that right." Id.

As discussed previously, taking as true Puglia's contention that he was a career-service employee, Puglia had an established legal right to have a termination appeal hearing before a Career Services Appeal Board. (Doc. # 82-4 at 2-3). It was not discretionary for the Board to consider an appeal: if an appeal was timely filed by a career-service employee, the Board must hear the appeal.

Thus, a post-termination hearing or, if that was denied, the filing of a writ of mandamus in state court were adequate state remedies available to Puglia.[3] Because an adequate state

---

[3] If Puglia had requested and received a hearing, the parties appear to agree that such a post-termination hearing would have satisfied due process. See (Doc. # 100 at 19) (Puglia's response, stating that "an adequate remedy was provided by H.B. No. 1441 with its provision providing for an appeal to the Career Service Appeals Board"). If such a hearing was conducted and Puglia was dissatisfied with the way the hearing was held, Puglia could then have sought a writ of certiorari. See De Groot v. Sheffield, 95 So. 2d 912, 915-16 (Fla. 1957)

remedy was available, Puglia cannot establish that a procedural due process violation occurred. <u>See</u> <u>McKinney</u>, 20 F.3d at 1557 ("[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."). Summary judgment must be granted.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Sheriff Alvin Nienhuis, Kenneth Hayden, Philip Lakin, Scott Reak, John Ellis, William Hillman, and Joseph McClennan's Motion for Summary Judgment (Doc. # 80) is **GRANTED.**

(2) The Clerk is directed to enter Judgment in favor of Defendants and against Plaintiff Matthew Puglia and, thereafter, **CLOSE** the case.

(3) The Court retains jurisdiction to address the pending Motion for Sanctions (Doc. # 106).

---

("[C]ertiorari is a discretionary writ bringing up for review by an appellate court the record of an inferior tribunal or agency in a judicial or quasi-judicial proceeding. The writ is available to obtain review in such situations when no other method of appeal is available.").

36

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this
<u>11th</u> day of December, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

37